UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO M. MCINTOSH,

        Plaintiff,

vs.

        Case No. 07-CV-12969
        HON. GEORGE CARAM STEEH

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

_____/

## ORDER ACCEPTING REPORT AND RECOMMENDATION (# 28) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (# 26), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (# 23), AND DISMISSING PLAINTIFF'S CLAIM

This matter is before the court on the parties' cross-motions for summary judgment as to plaintiff Antonio McIntosh's claim for judicial review of defendant Commissioner of Social Security's denial of his application for disability and supplemental security income benefits, commencing March 26, 2003. McIntosh's claim is premised on alleged severe impairments arising from asthma, a medical history of a gunshot wound, and an anxiety/depressive disorder. The matter was referred to Magistrate Judge Mona K. Majzoub, who issued a twenty-six-page Report and Recommendation on April 17, 2009, recommending that defendant Commissioner's motion for summary judgment be granted, that McIntosh's motion for summary judgment be denied, and that McIntosh's claim be dismissed. The Magistrate Judge concluded there was substantial evidence in the record

to support the Administrative Law Judge's ("ALJ") decision at Step Five[1] that McIntosh retained the residual functional capacity ("RFC") to perform a limited range of light work, and that there are a significant number of jobs in the economy which McIntosh could perform. The Magistrate Judge also recommends denying McIntosh's request to remand based on new material evidence.

McIntosh filed timely objections on April 30, 2009. McIntosh objects that the Magistrate Judge applied an incorrect standard in denying his request for remand, that sub-70 I.Q. scores set forth in Ph.D. Edward Czarnecki's March 8, 2007 "Report of Psychological Evaluation" relate back to McIntosh's developmental years and prior to the onset of disability, that this new evidence creates a reasonable probability that the ALJ would have reached a different disposition if presented with the evidence, and that good cause exists for not presenting this type of evidence at his July 10, 2006 hearing because the ALJ refused McIntosh's request for further I.Q. testing. McIntosh also objects that the Magistrate Judge erred in upholding the ALJ's determination that McIntosh's subjective complaints were not entirely credible. McIntosh further objects that the Magistrate Judge erred by concluding that the ALJ's RFC assessment properly considered and weighed Dr. Hasan's July 20, 2003 diagnosis of Post Traumatic Stress Disorder ("PTSD"), and treating

---

[1] At the first step, the claimant must demonstrate the he is not gainfully employed at the time of application. The second step requires the claimant to show that he suffers from a severe impairment. The third step requires the claimant to show that his severe impairment meets or equals an impairment as listed in Appendix 1, Subpart P, Regulations No. 4 of the Social Security Act. See 20 C.F.R. § 404.1520(f). The fourth step entails the Commissioner's review of the claimant's residual functional capacity and relevant past work to determine if the claimant can perform his past work. If not, the analysis proceeds to the fifth step to determine whether the claimant can perform any other work available in the economy. See Howard v. Commissioner of Social Security, 276 F.3d 235, 238 (6th Cir. 2002).

physician Dr. Williams' diagnosis of major depressive disorder. McIntosh continues that the Magistrate Judge thus erred in finding that the hypothetical posed to the Vocational Expert ("VE") was complete, a hypothetical which McIntosh argues also failed to include the limitation of only occasional reaching. McIntosh objects that the Magistrate Judge erred by finding there was no conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT").

"A judge of the court shall make a de novo determination of those portions of a report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." Id.

A district court may affirm, modify, or reverse the Commissioner's decision, with or without remand. See 42 U.S.C. § 405(g). Findings of fact by the Commissioner are conclusive if supported by substantial evidence. Id. The court must affirm the decision if it is "based on [an appropriate] legal standard and is supported by substantial evidence in the record as a whole." Studaway v. Secretary of Health and Human Servs., 815 F.2d 1074, 1076 (6th Cir. 1987). A district court may remand to the Commissioner for consideration of new and material evidence that for good cause shown was not previously presented to the Commissioner. Faucher v. Sec. Health and Human Servs., 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)); Sizemore v. Sec. of Health and Human Servs., 865 F.2d 709, 711, 711 n.1 (6th Cir. 1988). For new evidence to constitute material evidence, the plaintiff must demonstrate there is a reasonable probability that the Commissioner would have reached a different disposition of the claim if presented with the new evidence. Sizemore, 865 F.2d at 711.

Contrary to McIntosh's objection, Magistrate Judge Majzoub properly articulated that a remand based on new evidence is warranted "only upon a showing that the evidence is new and material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  April 17, 2009 R&R, at 12-13 (citing 42 U.S.C. § 405(g) and Foster v. Halter, 297 F.3d 348, 357 (6th Cir. 2001)).  As also properly recognized by the Magistrate Judge, "[a] claimant shows 'good cause' by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  Id. at 13 (quoting Foster, 279 F.3d at 357).  The ALJ's denial of McIntosh's request for "consideration of psychological IQ testing," R, at 324, does not reasonably explain why McIntosh failed to acquire and present I.Q. testing evidence at the July 10, 2006 hearing.  To the extent McIntosh argues that the ALJ improperly denied his request for I.Q. testing, the ALJ acted within his discretion[2] when denying the request:

> [T]here's a couple reasons why [McIntosh] didn't [come] across to me as retarded, as you're describing.  But he has a work history inconsistent with mental retardation, he worked at a semiskilled job, he worked successfully up until the time of his injury and as I understand he worked for 10 years and there's no evidence he had a problem.  So, so I don't think it is warranted, I'm going to agree with [Medical Expert Ph.D. Ellen Rozenfeld] on that.

R, at 325.  Ph.D. Rozenfeld had previously testified:

> Q. [by McIntosh's Representative]  Okay.  So would it be unreasonable to think that it might be advantageous to have a Wechsler Adult Intelligence Scale to see if his IQ is potentially below 70?
>
> A.  He's been seen by professionals, none of whom have suggested that he is functioning with an IQ in the retarded range.  The psychiatrist didn't say

---

[2] "An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."  Foster, 279 F.3d at 355 (citing 20 C.F.R. §§ 404.1517, 416.917; Landsaw v. Sec'y of Health & Human Servs., 803 F.2d 211, 214 (6th Cir. 1986)).

4

> anything, his primary care physician, Dr. Williams, hasn't suggested that. So based on his file evidence, you know, there's been no indication of that and they don't know whether he was in special ed in school.

R, at 307. Absent good cause for presenting I.Q. testing evidence at the July 10, 2006 hearing, the Magistrate Judge properly denied McIntosh's request to remand. Faucher, 17 F.3d at 174; Sizemore, 865 F.2d at 711, 711 n.1. Given the ALJ's reasoning for denying McIntosh's request for I.Q. testing, the court is also persuaded there is no reasonable probability that the Commissioner would have reached a different disposition of McIntosh's claim if presented with Dr. Czarnecki's March 8, 2007 I.Q. testing evidence. Sizemore, 865 F.2d at 711.

McIntosh's objection as to the ALJ's credibility assessment is not well taken. The ALJ's credibility determination is entitled to deference, and is reviewed by this court under the "substantial evidence" standard. Franson v. Commissioner of Social Security, 556 F.Supp.2d 716, 726-27 (W.D. Mich. 2008) (citing Jones v. Commissioner of Social Security, 336 F.3d 469, 476 (6th Cir. 2003); Daniels v. Commissioner of Social Security, 152 Fed. App'x 485, 488 (6th Cir. 2005)). Contrary to McIntosh's argument that the ALJ's credibility determination "appeared premised predominantly on a dislike of [McIntosh] for being involved with crack cocaine," Plaintiff's April 30, 2009 Objections, at 6, the ALJ explained:

> [McIntosh] denied drug usage, although the April 2003 blood tests were positive for both cocaine and marijuana. . . . . [T]he fact remains that [McIntosh] denied drug use while there is at least one piece of objective evidence to the contrary. His credibility is also questionable, with his ongoing subjective complaints of chest pain, where he went for more than a year without seeing the doctor. Exhibit 10F, progress note dated July 22, 2004 ("last visit 15 months ago"). Next, he testified that he manufactured crack cocaine for only 5 months, but there is no way to verify that he did so only for 5 months, since, being an illegal activity, there is no evidence of earnings or income.

R, at 21. In examining McIntosh's claim of depression, the ALJ observed:

> The depression limits the claimant to unskilled work, with some functional limitations. He is capable of performing activities of daily living, being independent and caring for his son on alternate weekends. His ADL's are mildly limited. Social functioning is moderately limited, although he goes to religious services and was able to deal with strangers (general public) while manufacturing crack cocaine. His ability to concentrate seems to be affected, but he can remember his mother's medications for her and, again, manufacturing crack cocaine requires the ability to perform complex tasks, meaning he was able to concentrate while doing this. The claimant is moderately limited in concentration persistence and pace. In this regard, I agree with the testimony of Dr. Ellen Rozenfeld, Ph.D., the medical expert.
>
> [McIntosh's] subjective statements of limitations are not credible, being unsupported by the record and given the inconsistencies of his testimony and statements.

R, at 20. The ALJ's credibility determinations was properly based on conflicts between McIntosh's testimony and substantial objective evidence in the record, Franson, 556 F.Supp.2d at 726-27, not on the ALJ's "dislike" of McIntosh.

"A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion. The treating physician's opinion must be supported by sufficient medical data. If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection." Jones, 336 F.3d at 477 (internal citations omitted). A non-treating physician's opinion, "if anything," is entitled to less deference. Id.

In discounting non-treating Dr. Hasan's July 2003 diagnosis of PTSD, and treating-physician Dr. Williams' January 2006 diagnosis of major depressive disorder, the ALJ "agree[d] with the testimony of Dr. Ellen Rozenfeld, Ph.D., the medical expert." R, at 20. Ph.D. Rozenfeld testified at the July 10, 2006 hearing:

> A. [by Ph.D. Rozenfeld] [McIntosh has] been diagnosed with PTSD in July

6

of '03 and more recently with major depressive disorder in January of '06. He is also poly substance abuse.

Q. [by ALJ] How would you assess the severity of his condition?

A. Okay. The, the file evidence indicates the diagnosis made at the time of the psychiatric CE in July of '03, with no treatment subsequent to that. In the evidence that was submitted recently indicates that he is now being treated for depression and is on medication since, it looks like, January of '06. Now, there were records from the treating source, the Dr. Williams, spread I believe from '03 through '05, but there were no complaints of depression or anxiety, PTSD symptoms until '06, when she diagnosed him with major depressive disorder. And he was started on, it looks like at that point he was started on medication and the treatment notes from January of '06 through April of '06 indicates that there's been changes in medications, she's trying to find an effective medication. He was started on Lexapro, was changed to Effexor and then changed to Wellbutrin. So it seems at this point he is in treatment but they're still trying to find an effective medication to deal with the symptoms of depression. In regards to the issue of the outbreak hallucinations, [McIntosh] denied hallucinations at the time of the psychiatric CE in July and again there's no indication of [sic] a mention of outbreak hallucinations to Dr. Williams, for whatever that's worth.

Q. Okay.

A. Now in terms of the B criteria, in terms of ADL, I would list it as mild. He is engaging in some household tasks, he's independent in self-care needs, he cares for his son, he talked about being in a store when he got anxious, though he, I assume he's doing some light, at least, shopping. In terms of social functioning I would say moderate. Despite some anxiety when he's out in public he indicated he goes to the park with his son, he is going to serve at the religious services, but yet he retains the capacity to relate appropriately to people, to cooperate and to relate adaptively. In terms of concentration, persistence and pace I would also say that's moderate, he does complain of some deficient concentration, attending, yet he is reading a lot and he says he, he himself, reminds his mother to take her medication. So, again, there is a capacity for some concentration and attention.

Q. Any decompensations?

A. No evidence of decompensations.

Q. What, what would be the, your assessment of his ability to function?

A. I believe he retains the capacity to perform simple, routine, unskilled tasks

with moderate limitations in attending and concentrating for extended periods of time.  Some moderate limitations in terms of socially with possibly being distracted by coworkers, though there'd be some limitations in terms of - -

Q.  What were the social limitations, that was supervisors, coworkers and the general public, would he be able to do that?

A.  (No audible response.)

ATTY: Unable to hear the response.

ME: I said I believe he would be able to handle that.

BY ADMINISTRATIVE LAW JUDGE:

Q.  Any other (INAUDIBLE)?

A.  No, that would be it.

*       *       *

BY ADMINISTRATIVE LAW JUDGE:

Q.  Dr. Rozenfeld, she - - would he be able to follow simple instructions?

A.  He would be able to follow simple instructions.

*       *       *

Q.  Able to perform simple tasks on a job circumstance?

A.  Yes, he would.

Q.  Could he - - I'm trying to think what else is in that.

A.  He'd be able to make simple work related decisions.  He would also be able to sustain an ordinary routine.

R, at 299-302.  As he did, the ALJ could properly rely on this expert opinion and the cited underlying supporting evidence to discount the diagnoses of Dr. Williams and Dr. Hasan. R, at 20.  Jones, 336 F.3d at 477.  The ALJ was also authorized to give less weight to Dr. Williams' assessment of severe functional limitations because she was "a treating physician

8

(not psychiatrist)[.]" R, at 19. See 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.") The ALJ was not required to accept Dr. Hasan's or Dr. Williams' diagnoses or unsupported severe limitations. Jones, 336 F.3d at 477.

It follows that the ALJ did not err by failing to include Dr. Hasan's or Dr. Williams' assessments of McIntosh's limitations in determining McIntosh's mental RFC, or in posing his hypotheticals to the VE. The ALJ found that McIntosh has the RFC "to perform the full range of light work activity limited by exposure to pulmonary irritants and airborne pollutants[,]" and "is limited to work requiring the ability to follow simple instructions and perform simple tasks with only occasional contact with the general public, coworkers and supervisors." R, at 21. The ALJ determined that a light RFC was appropriate consistent with "the ability to lift/carry 20 pounds occasionally and 10 pounds frequently and reach occasionally[.]" R, at 22. The ALJ posed the following hypothetical to the VE:

> Q. [by ALJ] Assume an individual the claimant's age, education and work experience and assume further I would find from the medical evidence that the claimant could do the entire universe of exertional or non-exertional work with the exception that the claimant would be limited to lifting 20 pounds occasionally, 10 pounds frequently. He would have a limited to occasional reaching with the right arm and would have to avoid concentrated exposure to pulmonary irritants. He would be limited to jobs that would require only the ability to follow simple instructions, perform simple tasks, perform an ordinary, simple routine and there was one other - - now wait. Can follow simple instructions, simple routine and he could make simple job, job related decisions. He also would be limited to occasional contact with the general public, coworkers and supervisors. Could he return to his past relevant work?
>
> A. [by VE] No.
>
> Q. Would there be other jobs that he could perform?

9

    A. He, he is in the 20 pound occasional and 10 pound frequently we're looking at light level jobs. So one of the jobs which has an SVP of 1 and is considered as a hand packer and for the Detroit area it's 15,855 jobs.

    \* \* \*

    Q. Okay. And do you have any other jobs?

    A. Machine tender, that's an SVP of 2, that's also considered light and for Detroit it's 8,359.

    Q. Now is your answer consistent with the Dictionary of Occupational Titles?

    A. Yes.

R, 315-316. Based on the VE's testimony, the ALJ found at Step Five that McIntosh was "not disabled." R, at 22.

    Contrary to McIntosh's objection, both the ALJ's written decision and his hypothetical to the VE incorporated a limitation of occasional reaching. R, at 22, 315. The VE testified that his finding that jobs existed in the Detroit economy was consistent with the ALJ's hypothetical, which included the limitation of "occasional reaching," and the DOT. R, at 316. McIntosh has failed to demonstrate otherwise. To the extent the ALJ's decision could be read as not including an "occasional reaching" limitation, any conflict would be harmless; McIntosh would be able to perform a job limited to "occasional reaching" if he did not have such a limitation. McIntosh's objection that the Magistrate Judge erred by finding there was no conflict, or that any resulting conflict would constitute harmless error, is not well taken.

    Upon de novo review, McIntosh's objections are OVERRULED. Accordingly,

    The court hereby adopts the April 17, 2009 Report and Recommendation consistent with the analysis herein. Plaintiff McIntosh's motion for summary judgment is hereby DENIED. Defendant Commissioner of Social Security's motion for summary judgment is

hereby GRANTED.  McIntosh's claim is hereby DISMISSED with prejudice.

    SO ORDERED.

Dated:  July 13, 2009

                          s/George Caram Steeh
                          GEORGE CARAM STEEH
                          UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
July 13, 2009, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk